IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos. 8-CR-038-GKF |
| | ) | 11-CV-181-GKF-PJC |
| BOBBY EUGENE SCOTT, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION AND ORDER**

Before the court is the 28 U.S.C. § 2255 habeas corpus motion [Dkt. #48] filed by defendant Bobby Eugene Scott, Jr. ("Scott"). The United States opposes the motion.

**Procedural History**

On March 4, 2008, a two-count indictment charged Scott with violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2). [Dkt. #2]. The court appointed Art Fleak to represent Scott. [Dkt. #7]. Scott moved to suppress evidence. [Dkt. #13]. On April 16, 2008, the court denied the motion after an evidentiary hearing. [Dkt. #20, Dkt. #25, Tr. at 79:17-20]. On April 25, 2008, pursuant to a written plea agreement, Scott pleaded guilty to Count One of the indictment, reserving the right to appeal the denial of his motion to suppress. [Dkt. #23, Dkt. #57]. On December 5, 2008, the court sentenced Scott to imprisonment for 51 months followed by supervised release for three years. [Dkt. #41]. Scott did not appeal. According to the Bureau of Prisons website, Scott was released from federal custody on December 14, 2011.

**Relevant Facts**

On February 15, 2008, Tulsa Police Department ("TPD") officers Jeff Henderson and Frank Khalil were driving north on Detroit Avenue when they saw a light blue older model car drive into a field, heading east toward Elgin Avenue. [Dkt. #25, Tr. at 4-6, 13]. They began to follow it through the field at a distance. [*Id.* at 5-6]. Meanwhile, TPD Detectives Eric Nelson and Shawn Hickey and Tulsa County Sheriff's Office Corporal Shane Rhames, who were traveling south on Elgin in a uniform patrol car, observed a blue Buick Roadmaster cut across a field and turn south on Elgin directly in front of them. [Dkt. #25, Tr. at 20-22]. Officer Nelson saw that the driver, later identified as Bobby Eugene Scott, was not wearing his seatbelt. [*Id.* at 28, 37]. Detective Nelson activated the emergency lights and Hickey and Rhames saw Scott bending over, making furtive movements toward the center console with his right hand. [*Id.* at 28, 45-46, 68]. The Buick came to a stop in the area of 300 N. Elgin. [*Id.* at 22]. Nelson approached on the driver's side and Rhames and Hickey approached on the passenger side. [*Id.* at 23, 38]. Nelson asked Scott if he had a driver's license, and after looking around the car, Scott told the officers he did not have a license. [*Id.* at 23]. Nelson found identification belonging to Thomas Washington in Scott's wallet, after which Scott identified himself. [*Id.* at 25]. Nelson got Scott's information and ran a check through TPD records. [*Id.* at 26]. The officers arrested Scott for driving without a license. [*Id.* at 26, 36-37]. Hickey asked Scott if he had anything illegal in the car and Scott said no. [*Id.* at 49]. Rhames and Hickey searched Scott's car. [*Id.*]. Hickey found a loaded handgun under the bench-type front seat. [*Id.*]. As Hickey started walking back to Scott after he found the gun, Scott stated, "That's my girlfriend's vehicle, whatever is in there it's not mine. [*Id.* at 27, 50].

**Suppression Hearing**

In his Motion to Suppress, Scott asserted that on the evening the stop occurred, TPD officers were watching the front door of The Hive because the officers, who were affiliated with the gang unit of the TPD, were looking for gang members. [Dkt. #13 at 3-4]. Scott alleged he drove up from the north, parked on N. Elgin about 20 feet north of the entrance of The Hive, exited the car and started walking south toward the The Hive; and that TPD officers recognized him as a supposed gang member, exited their vehicles and approached him as he attempted to enter The Hive. [*Id.* at 4]. Further, Scott contended that while one police officer engaged him in conversation, another immediately began searching the car, then shortly thereafter confronted him with the gun, allegedly found in the car. [*Id.*].

At the suppression hearing on April 16, 2008, Officers Khalil and Nelson and Corporal Rhames testified on behalf of the government, and Officer Hickey was called to testify for the defense. Jeff Henderson did not testify at the hearing.

Officer Khalil testified he and Henderson had seen the traffic stop conducted by Officers Hickey, Nelson and Rhames, and had observed all three officers approaching the vehicle. [*Id.* at 6-7]. On cross-examination by defense counsel, Khalil was shown a number of pictures of the area where the arrest occurred. [*Id.* at 9-13]. He testified that before seeing Scott, he and Henderson were in an unmarked car, patrolling the area, and were aware that there was a concert at The Hive. [*Id.* at 11-12]. Khalil identified The Hive from several angles. [*Id.* at 9-13]. He pointed out on the pictures where Scott's car was parked. [*Id.* at 16]. He testified that after turning onto Elgin, he and Henderson proceeded south and left the scene. [*Id.* at 16, 18].

Officer Nelson confirmed that he, Officer Hickey and Corporal Rhames were in a patrol car going south on Elgin when they saw a car cutting through the field, turning south onto Elgin.

[*Id.* at 20-22]. Nelson saw Officers Khalil and Henderson following the Buick through the field. [*Id.* at 29]. Officers Khalil and Henderson drove by Officer Nelson's car as he stopped the Buick at about 300 N. Elgin. [*Id.* at 28]. Nelson testified he stopped Scott because he failed to signal his turn and had no seatbelt on. [*Id.* at 36-37]. Nelson approached the driver, later identified as Bobby Scott. [*Id.* at 23]. On cross examination, Nelson denied that Scott got out of the vehicle and started walking toward The Hive. [*Id.* at 36, 40-41]. He testified that Scott, who appeared nervous, told him he didn't have a license with him, but that he was going to a concert at the club. [*Id.* at 23]. Nelson found this suspicious, because most clubs have bouncers who check IDs for admission. [*Id.* at 24]. When Nelson patted Scott down, he felt a wallet, and asked Scott if he could check the wallet for ID. [*Id.* at 25]. When Nelson opened the wallet, he saw an ID for an individual named Thomas Washington; Nelson knew Thomas Washington, and knew Scott wasn't Washington. [*Id.*]. Corporal Rhames ran information on Scott and advised Nelson that Scott did not have a driver's license, at which point Nelson placed Scott under arrest. [*Id.* at 26]. Officer Hickey and Corporal Rhames searched the vehicle and advised Nelson they had found a gun in the car. [*Id.* at 27]. At that point Scott stated that it was his girlfriend's car and whatever was in there wasn't his. [*Id.*].

Corporal Rhames, a member of the FBI's gang task force, testified that he, Nelson and Hickey were driving southbound on Elgin and saw Scott's vehicle turn out of a field on to Elgin ahead of them. [*Id.* at 45]. He could see that Scott was not wearing a seatbelt. [*Id.*]. As they pulled up behind Scott, Rhames noticed that Scott was making furtive movements towards the center of the vehicle. [*Id.*]. Rhames testified that as Scott pulled out over the curb to the street, he was leaning to the left toward the door; then, as the police car pulled up behind him to initiate the traffic stop, Scott was no longer leaning to the left, but was "more toward the middle kind of

4

slumped over this way and you could see like up and down movement like reaching toward the center of the vehicle . . . [t]oward the center console or the center hump of the vehicle." [*Id.* at 45-46]. After Scott identified himself, Rhames ran his name through teletype to check for a driver's license, and determined Scott had no license. [*Id.* at 48]. Rhames testified that after Scott was arrested, Officer Hickey asked him if he had anything illegal in the vehicle because the officers were going to look. [*Id.* at 49]. Scott said no. [*Id.*]. Hickey and Rhames went to the car; Hickey was on the driver's side and Rhames was in the rear portion of the vehicle on the passenger side. [*Id.*]. As Rhames was backing out of the vehicle to move towards the front, he heard Hickey say, "got a gun underneath the seat here on the front console." [*Id.*]. Rhames testified he leaned forward, looked underneath, and saw the gun, which was on the center hump of the vehicle just below the driver's area with the butt closer to the driver's side of the seat. [*Id.*]. Rhames testified that if he had been sitting in the driver's seat, he could have reached down and pulled the gun up straight in his hand. [*Id.*]. Rhames stated that after they had found the weapon and were walking back , Scott said "whatever is in there is not mine, something like that, it's my girlfriend's car." [*Id.* at 50]. Rhames testified that Scott did not drive up, park and get out of his car at any point in time and did not walk to The Hive before the police officers talked to him, nor did he or Hickey search Scott's car while he was talking to other police officers. [*Id.*].

Scott's attorney called Shawn Hickey as a defense witness. Hickey testified that on February 15, 2008, he, Nelson and Rhames were on directed patrol in the area that included The Hive, a target location. [*Id.* at 63-64]. He stated he did not initially recognize Scott, but after Scott gave his name, Hickey knew of him. [*Id.* at 66]. Hickey testified that when the traffic stop was initiated and emergency lights were turned on, Scott "started making furtive movements,

bent over forward with . . . what appeared to be his right hand." [*Id.* at 68]. He said that after Scott was arrested, he searched his vehicle and found the weapon. [*Id.* at 68, 70]. When defense counsel asked him how he could see Scott's vehicle in the field when there was a wall between the police car and the field, Hickey acknowledged there was a wall in the picture defense counsel showed him, but he insisted that he could see Scott's vehicle driving in the field. [*Id.* at 68-70]. Upon cross-examination by the government's attorney, Hickey testified he did not see Scott pull his car to the curb, get out and walk halfway to the front door of The Hive before officers approached him. [*Id.* at 72]. He again stated that he searched Scott's car after Nelson told him Scott was arrested, and explained this was normal procedure. [*Id.* at 73-76].

At the conclusion of the hearing, the court denied Scott's Motion to Suppress. [*Id.* at 79].

In the pending Section 2255 motion, Scott asserts he only recently learned that "the main officer testifying against him, Shawn Hickey, ha[d] been named as an unindicted co-conspirator in the ongoing police corruption scandal." [Dkt. #48 at 2]. Scott alleges the failure to provide him with impeachment information about Hickey before the suppression hearing violated *Brady*. Further, he states:

> [T]he main police officers (Jeff Henderson, who also testified against him at his suppression hearing, Bruce Bonham and Bill Yelton) responsible for organizing the other witnesses—all convicted felons, or people charged with felonies, or their immediate family, hoping to get leniency—where [*sic*] themselves, at times possibly extending before [Scott's] jury trial, engaged in a conspiracy with other police officers to unlawfully arrest, convict and imprison persons.

[Dkt. #48 at 5]. Scott contends this information should have been provided to him before the suppression hearing. [*Id.*]. Further, Scott attached to his reply brief a June 30, 2012, article published in the Tulsa World. The article reported that Jeff Henderson had testified on June 29, 2012, in a hearing before Judge James H. Payne on a Section 2255 motion filed by Tony M. Becknell (Case No. 4:05-CR-84-JHP), that in March 2005, Scott, acting as a confidential

6

informant, provided Henderson with information that served as the basis for the search warrant affidavit Henderson signed before Becknell's arrest in 2005.[1]

## Analysis

Scott contends the government's failure to inform him of Officer Hickey's involvement in the TPD corruption scandal before his suppression hearing or guilty plea violated *Brady v. Maryland*, 373 U.S. 83 (1963). Additionally, he argues that, had he been made aware in advance of the suppression hearing or his guilty plea that Henderson would later testify he was a major confidential informant, "the result of this case certainly would have been different, and Mr. Scott would probably have stood trial and been found not guilty at trial." [Dkt. # 59 at 5].

Due process requires prosecutors to "avoi[d] an unfair trial" by making available "upon request" evidence "favorable to an accused where the evidence is material either to guilt or punishment." *Brady*, 373 U.S. at 87. This requirement extends to evidence affecting witness credibility, where the witness' reliability is likely determinative of guilt or innocence. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

However, the Constitution does *not* require federal prosecutors to disclose impeachment information relating to any informants or other witnesses prior to entering a plea agreement with a criminal defendant. *United States v. Ruiz*, 536 U.S. 622, 625 (2002). As the court in *Ruiz* explained, "[w]hen a defendant pleads guilty he or she, of course, forgoes not only a fair trial, but also other accompanying constitutional guarantees." *Id.* at 628. The court stated, "Given the seriousness of the matter, the Constitution insists, among other things, that the defendant enter a

---

[1] Scott testified in a hearing in the Becknell case on July 6, 2012, and Tulsa County Jail records confirmed, that he was in jail from January 27, 2005 to June 7, 2005. Further, he testified he was not the alleged confidential informant Henderson used to investigate Becknell and had never at any time in his life cooperated with the Tulsa Police Department to provide information against Becknell. [Case No. 05-CR-84-JHP, Dkt. #141]. The government subsequently conceded Becknell's Section 2255 Motion to Vacate and moved to dismiss Becknell's indictment, and the court granted the relief requested, vacating the judgment and sentence and dismissing the indictment. [*Id.*, Dkt. #160].

7

guilty plea that is 'voluntary' and that the defendant must make related waivers 'knowing[ly], intelligent[ly], [and] with sufficient awareness of the relevant circumstances and likely consequences." *Id.*  Impeachment information, though, "is special in relation to the *fairness of a trial,* not in respect to whether a plea is *voluntary.*" *Id.*

Furthermore, the obligation to turn over impeachment information about witnesses applies only to government witnesses. *United States v. Green,* 178 F.3d 1099, 1109 (10th Cir. 1999). Defendant, rather than the government, called Hickey as a witness at the hearing on the motion to suppress.

Finally, even had the government been obligated to provide Scott with information about Hickey, Scott cannot demonstrate that the impeachment information was material because Hickey's testimony was cumulative in nature. The Tenth Circuit has stated, "In instances where we have concluded that the allegedly suppressed impeachment evidence was material, we have stressed that the witness being impeached was absolutely critical to the government's case." *United States v. Cooper*, 654 F.3d 1104, 1123 (10th Cir. 2011). In *Cooper,* the appellate court concluded the witness at issue was not a critical witness to the government's case because several other co-conspirators provided commensurate testimony, and therefore the district court was correct in concluding the witness's testimony was merely cumulative. *Id.*

Similarly, in this case, Hickey's testimony about the traffic stop and arrest of Scott was cumulative to that of Nelson and Rhames. Officer Nelson confirmed he saw Scott's car cutting through the field and stopped the car at about 300 N. Elgin. He testified that after he arrested Scott, Hickey and Rhames searched the Buick and found a gun in the car. Corporal Rhames also testified that he, Nelson and Hickey were patrolling and stopped Scott's car. He, like Hickey, testified that he saw Scott leaning forward and making furtive movements toward the center of

the vehicle and confirmed that he and Hickey searched the Buick after Scott was arrested. Like Hickey, Nelson and Rhames both denied that Scott parked, got out of his car and walked to The Hive before being stopped by the officers. Clearly, Nelson and Rhames provided testimony commensurate with Hickey's; therefore impeachment information about Hickey was not material to the outcome of the suppression hearing.

Scott complains that the government also failed to provide impeachment information about Jeff Henderson, Bruce Bonham and Bill Yelton. Although Henderson was in the other car with Frank Khalil, he was not called to testify at the suppression hearing. Neither Bonham nor Yelton had any involvement in the Scott case. Thus, even assuming that at the time of the suppression hearing the government knew of these individuals' conduct, it was not relevant to the hearing on the motion to suppress.

Nor does Henderson's June 2012 false testimony in the Becknell case provide a basis to vacate Scott's conviction. Even assuming the government could have known in 2008 that Henderson would testify falsely in 2012, Henderson was not a witness in the hearing on Scott's motion to suppress, and, as previously stated, the Constitution does *not* require federal prosecutors to disclose impeachment information relating to any informants or other witnesses prior to entering a plea agreement with a criminal defendant. *United States v. Ruiz*, 536 U.S. 622, 625 (2002).

## Conclusion

For the foregoing reasons, Scott's Section 2255 habeas corpus motion is denied.

ENTERED this 11th day of September, 2013.

_____
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

9